[S. F. No. 20814.   In Bank.   Jan. 16, 1962.]

WINSTON   CHURCHILL   BLACK, Petitioner, v.   THE STATE BAR OF CALIFORNIA, Respondent.

Landels, Weigel & Ripley, Stanley A. Weigel and Roger A. Parkinson for Petitioner.

Garrett H. Elmore for Respondent.

THE COURT.—After two hearings before a local administrative committee the Board of Bar Governors has found that petitioner misappropriated funds entrusted to his care by a client and wilfully commingled his own funds with those of a client. The board recommends that petitioner be suspended from the practice of law for three years.

Petitioner was retained in 1944 by the Friesleben Estate Company, a corporation organized in 1899 and dissolved in 1949. Sometime in mid-1944 petitioner was made a director, and in 1946 secretary-treasurer, of the corporation. In these capacities and as counsel, petitioner received $121,263.74 on behalf of the corporation.

At different times he maintained three bank accounts in which corporate funds were held. He had a trustee account at the Crocker Bank in San Francisco, which is not relevant to the questions here at issue. He had a trustee account at the Bank of America, San Francisco Main Branch, from which most of the disbursements of corporate funds were made. Finally, he opened a commercial account in the name of the corporation at the First National Bank of San Mateo. For convenience, the Bank of America account will be referred to as the trustee account. The First National Bank account will be referred to as the corporation account.

The evidence establishes that petitioner deposited in the corporation account all funds received on behalf of the corporation. He then transferred them piecemeal to the trustee

account, from which disbursements were made. The difficulty of establishing petitioner's guilt or innocence with respect to the misappropriation charge arises from his failure to keep adequate records of these transfers and disbursements.

"It would be a distortion of justice to permit a trustee, or attorney handling funds of a client, to escape responsibility by the simple act of not keeping any record or data from which an accounting might be made." (*Bruns* v. *State Bar*, 18 Cal.2d 667, 672 [117 P.2d 327].) Nevertheless, "charges of unprofessional conduct on the part of an attorney should be sustained by convincing proof and to a reasonable certainty and . . . any reasonable doubts should be resolved in favor of the accused. [Citations.]" (*Brawner* v. *State Bar*, 48 Cal.2d 814, 818 [313 P.2d 1].) Although "The burden is upon one seeking a review of a recommendation of the Board of Governors to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful [citations]" (*Rock* v. *State Bar*, 55 Cal.2d 724, 726 [12 Cal.Rptr. 857, 361 P.2d 585]), "findings of fact by local administrative committees and the Board of Bar Governors are not binding on the Supreme Court, which will weigh and pass upon the sufficiency of the evidence to sustain the findings of the board." (*Ibid.*; *Sturr* v. *State Bar*, 52 Cal.2d 125, 127 [338 P.2d 897].) We have concluded that the evidence does not establish that petitioner misappropriated funds belonging to the Friesleben Estate Company.

Respondent relies upon income and disbursements during the years 1953 and 1955 to establish petitioner's guilt. Prior to mid-August 1953 petitioner received and deposited $75,222.93 in the corporation account for the corporation. He transferred $43,100 from the corporation account to the trustee account. Of this sum he disbursed $13,546.53 from the trustee account on behalf of the corporation. In late August 1953 petitioner and the corporation agreed that petitioner's fee should be $35,000 for his services to date. Petitioner, however, was not entitled to this fee at the time approximately $29,500 over the established disbursements on behalf of the corporation had already been transferred to the trustee account.

Although petitioner testified that the trustee account was not used for the retention of money, he also testified that at all times funds for which he was accountable were held either in the corporation account, the trustee account, or in the form of cashier's checks. Respondent offered no evidence tending

to establish that petitioner was not holding the $29,500 either in the trustee account or in the form of cashier's checks. Notwithstanding the absence of such evidence, the board expressly found that petitioner took his fee before he was entitled to it by agreement with the corporation.

In late 1953 and early 1954 most of the remaining $32,122.93 was withdrawn from the corporation account. During this period petitioner disbursed $10,000 from the trustee account on behalf of the corporation. Thus, at the conclusion of the 1953-1954 transactions, petitioner was accountable to the corporation for $16,676.40, of which only a small part remained in the corporation account. The record is devoid of evidence that petitioner misappropriated any part of this sum. Indeed, petitioner testified that at about this time he began the purchase of cashier's checks to hold personally to protect the funds of the corporation against attachment in threatened litigation. Although petitioner offered no evidence corroborating this testimony, nothing of a substantial character in the record provides a basis for doubting that the outstanding balance of corporate funds was either on deposit in the trustee account or held in cashier's checks, or both.

During 1955 petitioner received and deposited $27,500 in the corporation account. He made various withdrawals aggregating $27,300. The evidence establishes that this sum was deposited in the trustee account. Petitioner was entitled to a contingent fee of $9,166.66 from the $27,500, and was thus accountable for the remaining $18,333.34. Petitioner disbursed $11,988.20 on behalf of the corporation, leaving a balance of $6,345.14 for which he was accountable. On September 30, 1955, the balance in the trustee account was $315.47.

Petitioner testified that the balance must have been held in cashier's checks. He could not recall, and had no record of the bank from which such checks were purchased. Respondent contends that ''The trustee bank statements themselves do not indicate any figures indicating the purchase of cashier's checks in substantial amounts from said trustee account.'' These statements, however, show that the two largest checks written on the trustee account during 1955, other than for disbursements admittedly made for the corporation, were for $2,000 and $3,477.50. Several other checks for almost $1,000 each were also charged to the trustee account. Thus, there is no evidence tending to contradict petitioner's admittedly uncorroborated testimony as to the existence of the cashier's checks.

A certified public accountant examined the available records and testified that the existence of such checks was not precluded. Respondent discounts this testimony because the board found that "Due to the failure or inability of respondent to furnish records from which a proper audit could be made, the opinion of the accounting witness was, at best, inconclusive on the matters which were relevant to this inquiry." The expert examined all the evidence available to the board. If this evidence was insufficient to render the expert's opinion conclusive, it would also seem insufficient to support a contrary finding.

Petitioner's final accounting established his liability to the company for $22,746.97. The accuracy of this accounting was not questioned, although it is not likely to have been completely accurate, considering the inadequate records kept by petitioner. Petitioner admits that the $22,746.97 was in neither the corporation account nor the trustee account. Indeed, he answered the demands of the corporate representatives with a cashier's check that admittedly represented a loan to his mother from a Los Angeles bank secured only a day or two before the check was tendered to the corporate representatives. Petitioner testified, however, that he was holding in his office safe a $25,000 cashier's check that was marked as representing corporate funds. The purpose for this secret holding was purportedly to protect the funds, and petitioner's possible interest therein, from attachment in connection with threatened litigation. Petitioner could not recall and had no record of the bank from which this check was purchased, its date, or any other detail. He testified that he intentionally purchased it in this way to render tracing extremely difficult, if not impossible.

Petitioner testified that before acquiring the $22,746.97 check in Los Angeles, he had been approached by one Charles H. White, a friend and client of long standing, who needed a substantial sum of money for a secret investment. It was imperative for White's purposes that the money invested not be traceable to him. After obtaining the $22,746.97 to pay the corporation, petitioner suggested that White use the $25,000 cashier's check, which he endorsed and sent to White by registered mail. White repaid the advance in several installments over the ensuing months. Petitioner testified that he had to borrow from his mother anyway because he was involved in protracted litigation and would receive no substantial income until its completion. The sole purpose for

borrowing the exact sum due to the corporation at the time of immediate need was to enable petitioner to accommodate White's need for a nontraceable investment fund.

Petitioner's testimony was corroborated in full by an affidavit sworn to by Charles H. White, now a resident of New York, reciting the details of the transaction. Petitioner's explanation is also supported by a number of large deposits to his account that could be indicative of White's repayments. Furthermore, petitioner's counsel, who at one point expressed a lack of belief in this "incredulous" story, offered to take the stand, be sworn, and testify that he had spoken by telephone to Charles H. White, and was able to identify him because of his knowledge of the check transaction. Respondent repeatedly suggested that petitioner produce White for cross-examination or take his deposition in New York. Petitioner professed willingness to do either at respondent's expense, but stated that he had no funds with which to do either himself. The board's finding that no $25,000 cashier's check existed is without support in the record and contrary to what evidence was adduced bearing on the question.

Respondent has failed to establish "by convincing proof and to a reasonable certainty" (*Brawner* v. *State Bar*, 48 Cal.2d 814, 818 [313 P.2d 1]) petitioner's guilt of misappropriation. Reasonable doubts that plainly exist are to be resolved in petitioner's favor. (*Cf. Clark* v. *State Bar*, 39 Cal.2d 161, 166 [246 P.2d 1].) The misappropriation charge is therefore dismissed.

The principal basis of the commingling charge is that petitioner received funds for the corporation in which he had an interest and that he failed to segregate his fees when he became entitled to them. He withdrew his fees in small amounts from time to time according to his needs, allowing his fee to remain mixed with the remainder of the corporate funds for a substantial period. Although such a course of conduct has not been clearly defined as commingling in violation of rule 9 of the Rules of Professional Conduct (see *Dreyfus* v. *State Bar*, 54 Cal.2d 799, 802 n. 3 [356 P.2d 213], alluding to such an interpretation), it seems plain that it should be so defined. ██ "[C]ommingling is committed when a client's money is intermingled with that of his attorney and its separate identity lost so that it may be used for the attorney's personal expenses or subjected to claims of his creditors. [Citations.] ... ██ The rule against commingling 'was adopted to provide against the probability in some

cases, the possibility in many cases, and the danger in all cases that such commingling will result in the loss of clients' money. . . .' [Citation.]'' (*Clark* v. *State Bar*, 39 Cal.2d 161, 168 [246 P.2d 1].) ▮ Petitioner received one check drawn to the order of the corporation that included $18,333.34 for the corporation and $9,166.66 for his fee. He handled the entire $27,500 through the same bank accounts as a single fund against which he drew both for corporate and personal purposes. Had he received two checks, one for the corporation and one for himself and then handled those funds together, his guilt of commingling could not be questioned. The risk to the client's money, either from mismanagement by the attorney or from attachment by his creditors, is the same in either case. Similarly, when petitioner became entitled to take his fee from his client's funds already held by him and allowed his fee to remain mixed with those funds and drew against the single account for both corporate and personal purposes, he subjected the client's funds to the very risks that the commingling rule is designed to protect against. When petitioner received corporate funds in which he had an agreed interest, he should have separated his money from the balance at the earliest reasonable time. When he held his client's funds, part of which he subsequently became entitled to take for himself, he should have separated his money from the balance at the earliest reasonable time after his own interest became fixed.

▮ In the absence of any prior decision holding that petitioner's actions violated the commingling rule, however, we have concluded that the charges against him should be dismissed insofar as they are based upon his failure to segregate his money from that of his client. This opinion, however, will serve prospectively as a guide to the profession. (*Cf*. *Hildebrand* v. *State Bar*, 36 Cal.2d 504, 514 [225 P.2d 508].)

▮ Respondent also contends that the charge of commingling is supported by the fact that the $25,000 cashier's check petitioner testified he held represented $22,746.97 belonging to the corporation and $2,253.03 belonging to him. The ownership of the obligation, however, was not so divided. Although the record is unclear, it appears that the cashier's check was originally purchased wholly with corporate funds, so that at all times it represented an obligation owing to the corporation. If petitioner subsequently disbursed his own money for corporate purposes to avoid having to liquidate the cashier's check and thus defeat his objective in purchasing it,

he did not thereby acquire any interest in the obligation owing to the corporation. Rather the corporation became indebted to him for the amount of proper disbursements. The record is clear that petitioner did not treat the check as partly his own and partly that of the corporation. The check remained intact until petitioner settled with the corporate representatives. The $25,000 cashier's check, unlike the corporation's funds deposited in petitioner's trustee account, was at no time subjected to the risk of loss sought to be avoided by the commingling rule. The existence and handling of the cashier's check affords no support for the commingling charge. That charge is therefore dismissed.

Prior to 1956, petitioner's practice of holding his client's funds in the form of cashier's checks, or even in cash (see *Clark* v. *State Bar,* 39 Cal.2d 161, 166 [246 P.2d 1]), was permissible. In 1956, however, rule 9 of the Rules of Professional Conduct was amended to require that all clients' funds be deposited in a designated account, separate from the attorney's personal accounts, in a bank or trust company authorized to do business in this state unless the client otherwise directs in writing. Petitioner's retention of his client's funds in a cashier's check held in his office without written permission of his client clearly violated the amended rule. The amendment applies to funds already in petitioner's possession as well as to any after-acquired funds.

Petitioner's record as an attorney since his admission to practice in 1928 is without previous blemish. He has served in a number of public capacities, including his present position as city attorney of the Town of Atherton and his former position as city judge of that community. His reputation for integrity and honesty is of the highest, and was attested to in these proceedings by several witnesses. He has demonstrated his good faith by undertaking the reorganization of his office procedures in accordance with the recommendations of an established accounting firm.

Petitioner, however, not only violated rule 9 as amended but failed to maintain proper office records. For these infractions it is sufficient that petitioner be reprimanded publicly. This opinion shall serve as such reprimand.